# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

September 23, 2020

Lyle W. Cayce
Clerk

———————

No. 19-40336

———————

MICHAEL DAVID STUNTZ, Individually and on Behalf of All Those
Similarly Situated,

> Plaintiff - Appellant

v.

LION ELASTOMERS, L.L.C.; ASHLAND ELASTOMERS, L.L.C.,

> Defendants - Appellees

———————

Appeal from the United States District Court
for the Eastern District of Texas
USDC No. 1:14-CV-173

———————

Before SMITH, GRAVES, and HO, Circuit Judges.

JAMES E. GRAVES, JR., Circuit Judge:*

Plaintiff-Appellant Michael Stuntz filed this suit, individually and on behalf of all those similarly situated, against Ashland Elastomers, L.L.C. ("Ashland"), ISP Synthetic Elastomers, L.L.C. ("ISP"), and Lion Elastomers, L.L.C. ("Lion") for violations of unpaid overtime under the Fair Labor Standards Act, 29 U.S.C. § 201, et seq ("FLSA"). Stuntz also asserted a

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

retaliation claim under FLSA. For the following reasons, we affirm the district court's grant of summary judgment in favor of Defendants.

## I.  BACKGROUND

### A. Factual History

Defendants ISP, Ashland, and Lion successively owned an elastomers and synthetic rubber manufacturing plant located in Port Neches, Texas between 2009 and 2014. Originally, ISP operated the facility until Ashland purchased the assets of the facility in 2013. After this lawsuit was filed, Lion purchased the assets in 2014.

Throughout the plant's change in ownership, Stuntz worked in the plant's production unit with approximately 250 employees. Stuntz was also a member of the Steelworkers Union Local 228 ("the Union"), the collective bargaining representative of the production unit employees. The unionized employees are subject to a collective bargaining agreement ("CBA") negotiated by Ashland and the Negotiating Committee, which acted on behalf of the Union.

Production unit employees worked 12-hour shifts, rotating between the day shift (5:00 a.m. to 5:00 p.m.) and night shift (5:00 p.m. to 5:00 a.m.). Employees reported that they arrived anywhere from 5 minutes to 30 minutes early—between 4:30 and 5:00—to make the "early relief" period which was "off the clock" and not mandatory. Stuntz maintains that during the "early relief" period, employees would (1) don, doff, and store personal protective equipment ("PPE") and shower off chemicals; (2) meet with co-workers to discuss plant operations and safety issues for that day; and (3) receive instructions from foremen supervisors.

On May 28, 2013, Stuntz and other Union members filed a written grievance charging Ashland with FLSA violations for unpaid overtime during

"early relief" periods. The grievance demanded that Ashland "cease and desist from violating the Collective Bargaining Agreement" and requested alternative dispute resolution per the CBA's procedures. A few days later, Ashland responded stating that because the alleged violations in the grievance were not subject to the CBA, the Union should instead direct its complaint to the appropriate federal office administering FLSA.

Later that summer, Ashland changed its mind, explaining that it wanted to avoid time-consuming, costly litigation through a Department of Labor charge. Ashland engaged in several discussions with the Union over the grievance on "early relief" practices and unpaid overtime. Several individuals were involved in these meetings, including:

- Ashland's management team—Scott Hardegree (Plant Manager), Trudy Lord (Human Resource Manager), and Tom Rogers (Operations/Production Manager)

- Unionized employees—Stuntz, Dwayne Newman, Joe Wells, Joseph Colone, and Ernie Knod—who were members of the Union's Negotiating Committee (sometimes referred to as the Workers' Committee)[1]

- Richard Landry, the Local Business Agent and Director of the Steelworkers District 13 (representing multiple union sites in addition to Steelworkers Union Local 228)

---

[1] Stuntz stated that he, Newman, Knod, Wells, and Colone were members of the Workers' Committee in 2013 (at the time the Early Relief Payout was negotiated). Stuntz also explained that Newman acted as president (or spokesman) of the Workers' Committee when Wells was absent at meetings. Stuntz explained that the president is elected by union members to have the authority to negotiate and interpret the CBA.

Subsequent to these meetings, Ashland agreed to a payout ("the Early Relief Payout[2]") and distributed checks with a document entitled "Questions & Answers: Pay Correction and Change in Pay Rules—Operators," explaining to employees that the overtime payment was due to an "early relief" (or "30 minute change point rule") agreement between prior owners of the plant and the Union. Because Ashland could not "prove that [employees were] paid for all the time worked," Ashland agreed to go "back three years, the required repayment period for intentional violations of the Fair Labor Standards Act," and pay employees overtime based on "in and out punches." *See* 29 U.S.C. § 255(a). These back wages were calculated using the employees' actual punch times at the plant's main gate entrance ("punch to punch") but excluded six minutes per day to account for the time employees spent walking between the main gate and their workstations. Ashland then took the back wages owed and doubled the amount as a penalty (or liquidated damages) for Ashland's failure to pay the amount accurately at the time of pay. *See* 29 U.S.C. § 216(b).

The Early Relief Payout document also notified employees of new pay rules taking effect on September 15, 2013—(1) gate time clocks would be used for entry and exit from the plant; (2) assigned time clocks would be located closer to workstations to eliminate the need for any adjustments to punch times used for compensation; (3) the "30 minute change point rule" would be officially eliminated; and (4) employees would be paid punch to punch with a 1/10 hour (or 6 minute) rounding rule. After the initial payout, the Union complained that the payout amounts did not accurately reflect the Early Relief

---

[2] We note that Appellant refers to this payout as Ashland's response to the grievance or FLSA claim; Defendants refer to it as the Wage Agreement; and the district court also referred to it as the Wage Agreement. Because of the nature of this dispute, we refer to it as the Early Relief Payout.

Payout formula derived from the Q&A document. Ashland agreed to issue a second round of checks to address these concerns.

Ten months later, after filing the present lawsuit, Stuntz, who had worked at the plant for over four years, was terminated by Lion on January 27, 2015 for repeated violations of the Attendance Policy.[3]

## B. Procedural History

Stuntz filed this FLSA collective action for (1) accurate and complete payouts still owed under the Early Relief Payout and (2) compensation for time spent after the Early Relief Payout for donning and doffing PPE and other work activities such as meeting with coworkers and receiving safety instructions.[4] Stuntz also alleged an individual retaliation claim against Ashland and Lion for his termination after filing this FLSA action.

The district court conditionally certified the class under FLSA as all current and former employees (1) who worked at the Defendants' plant at any time during the prior three years, and "who reported to and badged in the plant

---

[3] The Attendance Policy explains that absences or tardiness become "excessive" and subject to written discipline when employees collect three absences in a 60-day period, four absences in a 180-day period, two tardies in a 30-day period, or four tardies in 60-day period. During his last weeks of employment, Stuntz was on a last chance agreement where he agreed that he would be fired upon another violation of the attendance policy. The disciplinary log and written notices documented Stuntz's violations and warnings, including an August 26, 2014 written warning for being tardy twice in 30 days; a September 8, 2014 written warning for safety violation; and a September 26, 2014 warning for being tardy on three occasions in 60 days.

[4] Plaintiffs' second claim—compensation of the "early shift relief practice"—is separate and apart from the first claim specifically brought under the Early Relief Payout. Plaintiffs claimed that after the time clocks were moved (per the Early Relief Payout), employees were "permitted and practically required to report to the worksite before the start of the pay period during and after which they are on the plant worksite and working prior to the start of the pay period—including but not necessarily limited to donning PPE, conducting work meetings, receiving work instructions from foremen and being engaged to wait to perform other work activities."

prior to the start of their pay period and either [a] donned the necessary PPE at the bathhouse, or [b] were already donned in the necessary PPE ready to begin work prior to the start of their pay period" and/or (2) "who remained at the plant after the end of their shift to doff prior to leaving the Plant."

The parties filed multiple motions for summary judgment. The Magistrate Judge recommended (1) granting Defendants' motions for summary judgment on the "early shift relief" claims arising from the Early Relief Payout on the ground that those claims are "preempted" by § 301 of the Labor Management Relations Act ("LMRA"); (2) granting Defendants' motions for partial summary judgment on post-Early Relief Payout claims for "early shift relief", donning and doffing, and other work activities because that time spent is *de minimis*; and (3) denying Plaintiffs' motion for partial summary judgment on continuing record keeping violations after the Early Relief Payout and relocation of clocks.

The Magistrate Judge also recommended granting Lion's and Ashland's separate motions for partial summary judgment on Stuntz's individual retaliation claim.

The district court adopted both the Magistrate Judge's report and recommendations and entered a final judgment disposing of all claims. Appellant filed a timely notice of appeal.[5]

## II.   STANDARD OF REVIEW

We review "summary judgment de novo, using the same standards as the district court." *Haggard v. Bank of Ozarks Inc.*, 668 F.3d 196, 199 (5th Cir. 2012). We "refrain from making credibility determination or from weighing the evidence." *Deville v. Marcantel,* 567 F.3d 156, 163–64 (5th Cir. 2009) (quoting

---

[5] Appellant is abandoning the state law claims pursued and dismissed in district court. The only remaining claims are the FLSA claims and Stuntz's individual retaliation claim.

*Turner v. Baylor Richardson Med. Ctr.,* 476 F.3d 337, 343 (5th Cir. 2007)). Summary judgment is proper when "there is no genuine dispute as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "All of the evidence introduced and all of the factual inferences from the evidence are viewed in a light most favorable to the party opposing the motion and all reasonable doubts about the facts should be resolved in favor of the nonmoving party." *Terrebonne Parish Sch. Bd. v. Mobil Oil Corp.*, 310 F.3d 870, 877 (5th Cir. 2002). "A genuine issue of material fact exists if the record, taken as a whole, could lead a rational trier of fact to find for the non-moving party." *Id.* at 877–78. Material facts are those that "might affect the outcome of the suit under the governing law." *Leasehold Expense Recovery, Inc. v. Mothers Work, Inc.,* 331 F.3d 452, 456 (5th Cir. 2003) (internal citation omitted).

## III.   DISCUSSION

### A. The Early Relief Payout and Release of FLSA Claims

Appellant maintains that he may sue for alleged FLSA violations covered by the Early Relief Payout because employees have still not received the proper compensation owed under that agreement. The parties dispute whether the Early Relief Payout is part of or "inextricably intertwined" with the CBA and whether the LMRA therefore "preempts" Appellant's FLSA claims. But this is not the right terminology or framework for determining the viability of Appellant's FLSA claims in the aftermath of the Early Relief Payout. Instead, we need only determine whether the Early Relief Payout constitutes a valid "release" of Appellant's FLSA claims, and therefore, whether any purported violation of the *settlement agreement*—the Early Relief Payout—must be brought under the LMRA.

### 1. Relevant Law

"The FLSA requires any employee working over 40 hours in a week to be paid overtime, premium compensation at the rate of one and one-half times their 'regular rate' of pay." *York v. City of Wichita Falls*, 48 F.3d 919, 921 (5th Cir. 1995) (citing 29 U.S.C. § 207(a)(1)). Under FLSA, employers and employees may make "reasonable provisions of contract [to guide] the computation of work hours where precisely accurate computation is difficult or impossible." *See Tennessee Coal, Iron & Railway Co. v. Muscoda Local No. 123*, 321 U.S. 590, 603 (1944), *superseded by statute on other grounds*.

Section 301 of the LMRA, by contrast, allows federal courts to resolve disputes involving a "violation of *contracts* between an employer and a labor organization representing employees[.]" 29 U.S.C. § 185(a) (emphasis added). "Settlement agreements between employers and labor unions are included within this definition [of contracts]." *Dall v. Albertson's, Inc.*, 234 F. App'x 446, 447 (9th Cir. 2007). Such agreements need not be reduced to writing nor resolve all "substantive terms, including wage rates and workplace conditions." *See Int'l Bhd. of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers & Helpers-Local 1603 v. Transue & Williams Corp.*, 879 F.2d 1388, 1392 (6th Cir. 1989) (citations omitted) (noting that "the technical rules of commercial contract law need not be strictly applied to labor contracts").

As federal law, the LMRA also governs agreements involving "state-law rights and obligations that do not exist independently of private agreements, and [that] as a result can be waived or altered by agreement of private parties." *See Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 213 (1985); *McKnight v. Dresser, Inc.*, 676 F.3d 426, 433 (5th Cir. 2012). So "when resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract, that claim must

either be treated as a § 301 claim . . . or dismissed as pre-empted by federal labor-contract law." *Allis-Chalmers*, 471 U.S. at 220. And when determining whether a state law claim has been preempted by the LMRA, the relevant question is "whether evaluation of the . . . claim is inextricably intertwined with consideration of the terms of the labor contract." *Id.* at 213.

It was under this test that Appellees obtained summary judgment on Appellant's state law claims. But as the state law claims regarding Appellees' alleged violation of the Early Relief Payout have been disposed of, the *Allis-Chalmers* case law and associated "preemption" analysis are inapposite. "[T]he plaintiff has asserted claims for violation of federal law, rather than state law, and thus the doctrine of preemption under the LMRA does not apply." *Citchens v. Bellsouth Telecomm., Inc.*, 1997 WL 570855 at *2 (N.D. Miss. Sept. 3, 1997). Here, all we need to decide is whether the Early Relief Payout is a valid "release" of Appellant's FLSA claims—and thus whether Appellant has lost any right to (re-)litigate them under the FLSA.

We have held that when a private settlement agreement between a union and an employer resolves "a bona fide dispute as to the amount of hours worked or compensation due," individual union members' substantive FLSA rights may be validly "released" under that agreement. *Martin v. Spring Break '83 Prods., L.L.C.,* 688 F.3d 247, 255 (5th Cir. 2012); *see also Martinez v. Bohls Bearing Equip. Co.*, 361 F. Supp. 2d 608, 631 (W.D. Tex. 2005) ("[P]arties may reach private compromises as to FLSA claims where there is a bona fide dispute as to the amount of hours worked or compensation due. A *release* of a party's rights under the FLSA is enforceable under such circumstances." (emphasis added)). In such a circumstance, "FLSA rights [are] not waived, but instead, validated through a settlement of a bona fide dispute." *Martin*, 688 F.3d at 257. In determining whether a settlement agreement has released

individual plaintiffs' FLSA claims, we have considered whether the union had the authority to negotiate on behalf of the plaintiffs and whether the plaintiffs have "received and accepted full payment for the FLSA claims." *Id.* at 254. We have deemed it immaterial whether the individual union members personally signed on to the settlement agreement. *Id.*

### 2. Discussion

On May 28, 2013, the Union filed a grievance, alleging that the unpaid "early relief" period violated the FLSA, and requested the "rights in alternate [sic] dispute resolution." "As a general rule in cases to which federal law applies, federal labor policy requires that individual employees wishing to assert contract grievances must attempt use of the contract grievance procedure agreed upon by employer and union as the mode of redress." *Republic Steel v. Maddox*, 379 U.S. 650, 652 (1965).

As discussed above, a union's settlement agreement may resolve individual FLSA claims, so long as the agreement "validated" the rights by *bona fide* settlement and not waiver. *Martin*, 688 F.3d at 257. Accordingly, a union and an employer may validate substantive FLSA claims such that individual employees are subsequently barred from bringing those already-resolved FLSA claims under the FLSA.

Here, the extensive record reveals that the Early Relief Payout was indeed a legitimate, authorized—albeit somewhat unwritten—agreement that served as a settlement of the grievance over the alleged FLSA violations. "Under the CBA, [Ashland] recognized 'the Union as exclusive representative of the employees in the bargaining unit.'" *Id.* at 249. "In addition, the CBA outlined the procedure for Union members to follow when filing grievances against [Ashland]." *Id.* Each step of this procedure implies that an informal agreement settling a grievance could be reached in its early stages. For

example, Ashland could choose to "accept" the grievance by "adjust[ing] to the satisfaction of the employee," or otherwise a "settlement [may be] reached." Pursuant to these procedures, the Union filed a grievance over the FLSA violations, "demand[ing] that the Company cease and desist from violating the Collective Bargaining Agreement, that the incident(s) be rectified, that proper compensation, including benefits and overtime, at the applicable rate of pay, be paid for all losses; and further that those affected be made whole in every respect."

It is undisputed that Ashland met with Union representatives on multiple occasions over the grievance. After those meetings, Ashland agreed to the Early Relief Payout, reflecting Ashland's determination that it could not "prove that [employees were] paid for all the time worked," and thus purported to provide employees with double backpay for the last three years. Along with the Early Relief Payout document sent to employees was "enclosed [a] check[] [and] calculation worksheet." "Appellants accepted and cashed settlement payments." *Id.* at 257. Subsequently, the Union sent a letter to Ashland, asserting that Ashland issued payout amounts that did not accurately reflect the Early Relief Payout formula. The Union stated it would "move forward if Ashland fails . . . to comply and make the Employees 'whole' [within the following few weeks]," taking such failure as "cause to take this matter to the DOL in a formal complaint." Ashland soon announced a "pay correction" and issued a second round of checks. It does not appear that the Union itself took further issue with the grievance.  Despite the parties' conflicting impressions of their negotiations, these ceased to matter once the Union and Ashland entered into the Early Relief Payout, an informal agreement under which Ashland would—in the Union's own terms—"accurately compensate workers under the agreed terms of this issue by the Union and the Company."

It is indisputable that the parties to the Early Relief Payout—one of whom the CBA authorized to negotiate such grievances on Appellant's behalf—understood the agreement to resolve Appellant's FLSA claims. Further, the Early Relief Payout is "an enforceable resolution of those FLSA claims predicated on a bona fide dispute about time worked and not as a compromise of guaranteed FLSA substantive rights themselves." *Id.* at 255. Under the informal settlement, Appellant's FLSA rights were adhered to and addressed by the Union and Ashland, not waived or bargained away. *Id.* at 257. Because the record lends to summary disposition of this issue, we conclude as a matter of law that the Early Relief Payout was an enforceable settlement and valid release of the FLSA claims that it purported to resolve. Thus, Appellant no longer has recourse under the FLSA for those alleged FLSA violations covered by the Early Relief Payout. Any claim regarding an alleged violation of the *settlement agreement* must be brought pursuant to § 301 of the LMRA, which governs "contracts between an employer and a labor organization." 29 U.S.C. § 185(a).

## B. "Post-Early Relief Payout" Claims for Shift Relief, Donning and Doffing PPE, and "Off the Clock" Activities

Per the Early Relief Payout, early shift relief was discontinued as of September 15, 2013. Appellant argues that despite the relocation of time clocks closer to workstations, employees still engage in the practice of "early shift relief" that should be compensated under FLSA. Appellant also seeks compensation under FLSA for "donning and doffing PPE" and other "off the clock" activities. Defendants maintain that any time spent during the "early relief," "donning and doffing," and "off the clock" periods is *de minimis.*

The Portal–to–Portal Act "narrows the scope of compensable activities" under FLSA, exempting employers from liability for claims based on the following activities:

> (1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and
> (2) activities which are preliminary to or postliminary to said principal activity or activities,
> which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities.

*Bridges v. Empire Scaffold, L.L.C.,* 875 F.3d 222, 225 (5th Cir. 2017) (quoting 29 U.S.C. § 254(a)). "An activity is therefore integral and indispensable to the principal activities that an employee is employed to perform *if it is an intrinsic element of those activities and one with which the employee cannot dispense* if he is to perform his principal activities." *Integrity Staffing Sols., Inc. v. Busk,* 574 U.S. 27, 33 (2014) (emphasis added).

"It is only when an employee is required to give up a substantial measure of his time and effort that compensable working time is involved." *Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 692 (1946), *superseded by statute on other grounds.* Therefore, "[w]hen the matter in issue concerns only a few seconds or minutes of work beyond the scheduled working hours, such trifles may be disregarded" as *de minimis. Id.* "[I]n determining whether otherwise compensable time is *de minimis,*" the Ninth Circuit has distilled three factors for courts to consider: "(1) the practical administrative difficulty of recording the additional time; (2) the aggregate amount of compensable time; and (3) the regularity of the additional work." *Rutti v. Lojack Corp.*, 596 F.3d 1046, 1057 (9th Cir. 2010) (quoting *Lindow v. United States*, 738 F.2d 1057, 1063 (9th Cir. 1984)).

### 1. Early Relief Activities

The district court found the Plaintiffs' "early relief" activities to be *de minimis* by relying on its decision in *Hesseltine v. Goodyear Tire & Rubber Co.*, 391 F. Supp. 2d 509, 519–20 (E.D. Tex. 2005). In *Hesseltine*, the court analyzed "mandatory" person-to-person shift relief for employees working 12-hour work shifts. *Id.* at 512. The employer's pay policy explained that "shift relief" must be "made within a half hour window prior to regular start time." *Id.* Because employees alleged working "ten to fifteen minutes or more" during shift relief, the district court ruled that the time was "*de minimis* as a matter of law*"* and only "equivalent of 1.4% to 2.1% of work time on a twelve-hour shift." *Id.* at 520.

Similarly, Plaintiffs also worked 12-hour shifts and testified that it took sometimes as little as five minutes and up to 20 minutes to "make relief." Due to the variance in time spent on "early relief," Ashland maintains it relocated clocks per the Early Relief Payout to manage administrative difficulties in consistently recording employee times. The district court concluded that even when calculating Plaintiffs' relief time as 15 minutes, that time "would be considered *de minimis* because it constitutes only 2% of the entire work shift."

On appeal, Appellant notably does not take issue with the holding of *Hesseltine.* Instead, Appellant only argues that *Hesseltine* is distinguishable because (1) Ashland once determined that early shift relief was compensable under FLSA and (2) Defendants should now be barred from arguing that time is *de minimis* based on the doctrines of unclean hands and waiver. However, Appellant cites to no legal authority for the argument that a manager's prior statements about what he or she *perceived* to be protected under FLSA overcomes a finding as a matter of law that the early relief activities are *de minimis*. Accordingly, we find no error in the district court's determination

which is well supported by the employees' testimony that relief time lasts a few minutes and by the *de minimis* determinations of most courts. *See Von Friewalde v. Boeing Aerospace Operations, Inc.*, 339 F. App'x 448, 454 (5th Cir. 2009) (acknowledging that "most courts have found daily periods of approximately 10 minutes *de minimis* even though otherwise compensable") (citation omitted).

## 2. Donning and Doffing PPE

The district court determined that Plaintiffs' donning and doffing claims are not compensable due to 29 U.S.C. § 203(o) of the FLSA and because such time is *de minimis*. Section 203(o) provides "the time spent changing clothes is to be excluded from the measured working time [for purposes of § 207] if it has been excluded by custom or practice under a bona fide collective bargaining agreement." *Allen v. McWane, Inc.*, 593 F.3d 449, 453 (5th Cir. 2010) (citing *Bejil v. Ethicon, Inc.*, 269 F.3d 477, 479 (5th Cir. 2001)) (per curiam). "Simply put, the statute provides that the compensability of time spent changing clothes or washing is a subject appropriately committed to collective bargaining." *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 226 (2014).

Plaintiffs' personal protective equipment ("PPE") is "comprised of steel-toe boots, fire-retardant clothing, gloves, hard hats, and safety glasses," which the district court properly considered as "clothes" for purposes of Section 203(o). *See also Bejil,* 269 F.3d at 480 n.3 (finding that lab coats, shoe coverings, and hair or beard coverings fall under the definition of "clothes" in § 203(o)) (citing *Webster's Third New Int'l Dictionary* (1986) (defining "clothing" as "covering for the human body or garments in general")).

Defendants maintain that for at least twenty-six years, it has been the custom and practice to not compensate employees for donning and doffing PPE. As support, they cite to several versions of the Union's CBAs, none of which

described compensation for donning and doffing before and after work shifts. James Mosley, a production manager, started work at the plant in October 1990 and noted that production union employees were never paid for time spent putting on or taking off their PPE before and after shifts. Lord, the director of human resources, also stated that since 2001 she is not aware of any rule requiring employees to shower, change clothes, and put on PPE at the plant. Production unit employees had the option to do those activities at their homes.

On appeal, Appellant cites to Ashland's Early Relief Payout to pay wages based on "punch to punch minus 6 minutes" which some employees assumed or believed "covered [their] activities at the bathhouse." However, employees have not been entitled to additional FLSA compensation for the extra eight to ten minutes of clothes changing time that they requested during collective bargaining negotiations, but which was not incorporated into the executed CBA. *Hoover v. Wyandotte Chemicals Corporation,* 455 F.2d 387 (5th Cir. 1972). Even when an "employer had agreed to pay for changing time, where the employees raised the issue during CBA negotiations but there was no change in practice by the employer or change to the CBA on the issue, the relevant custom of non-payment for clothes changing time over fifteen minutes remained unaltered." *Allen*, 593 F.3d at 455 (summarizing *Hoover,* 455 F.2d at 389). Although the employees believed that the Early Relief Payout compensated for past donning and doffing, such speculation does not overcome the evidence of a more than 25-year practice of non-compensation, the clear absence of compensation for donning and doffing in any of the CBA's terms, and the Early Relief Payout's calculation terms that used employees' punch to punch time but excluded "the amount of time that it would have taken [the employee] to get to and from [his] worksite from the main gate."

Alternatively, the district court determined that the time spent donning and doffing generic PPE is not integral and indispensable to a principal activity. *See Von Friewalde,* 339 F. App'x at 454. Indeed, employees admitted their option of either taking the PPE home or leaving them at the facility. *See Bamonte v. City of Mesa,* 598 F.3d 1217, 1232 (9th Cir. 2010) (holding that donning and doffing police uniforms and related gear was not compensable as officers could change at home and there was "[n]o requirement of law, rule, the employer, or the nature of the work [that] mandate[d] donning and doffing at the employer's premises"); *Gorman v. Consol. Edison Corp.,* 488 F.3d 586, 594 (2d Cir. 2007) (noting that a helmet, safety glasses, and steel-toed boots may be indispensable to plaintiffs' principal activities without being integral); *Reich v. IBP, Inc.*, 38 F.3d 1123, 1126 (10th Cir. 1994) (holding that donning and doffing safety glasses, earplugs, a hard hat, and safety shoes were "essential to the job" but not "required by the employer" making them "preliminary" and "postliminary" activities falling outside of FLSA). Thus, Appellant's donning and doffing of PPE are not compensable under the FLSA. *Cf. Steiner v. Mitchell,* 350 U.S. 247, 251 (1956) (noting that clothes-changing and showering activities of the employees who worked in a "battery plant using dangerously caustic and toxic materials" are integral and indispensable part of their principal activities).

Lastly, we note that one employee testified that donning PPE usually took between "five and ten minutes"; but if laundry services were delayed or employees had to go to the front gate to get an alternate pair of coveralls, donning could sometimes take as long as "30 minutes." The same employee also stated that when doffing dirty clothes, some employees leave them for laundry services and that showering could take between ten to twenty minutes onsite. These events occurred "maybe once, maybe twice" a week but normally

workers left with their coveralls. However, even on the days when laundry delayed access to PPE, the "time appellants spent walking to and from their lockers at the beginning and end of each shift [is] non-compensable, as the Portal–to–Portal Act specifically provides that walking before and after the performance of an employee's principal activities is non-compensable." *Von Friewalde*, 339 F. App'x at 454. Appellant also does not dispute that changing generic protection gear, despite the plant's use of laundry services, is still in any event a "'non-compensable, preliminary task[]' under the Portal–to–Portal Act." *Id.* (citing *Gorman,* 488 F.3d at 594). Thus, the district court properly dismissed the donning and doffing claims.

### 3.  "Off the Clock" Activities

Lastly, Appellant seeks compensation for other activities including "meetings with co-workers and receiving instructions from supervisors." Appellant relies only on vague testimony that employees sometimes received job assignments from foremen during early relief. However, the district court noted that one employee admitted that foremen "would not give instructions before an employee punched in the time clock" and would not "talk to anybody [at work] unless they came to [the foremen]." Employees also testified that receiving instructions from foremen involved conversations that could last "a minute" or "three minutes," and in some cases, only three to four seconds. Typically, any exchange of information or directions was limited to a sentence—"I need you to go to C and D lines" or "You go to D Building." Because the time spent during these "off the clock" activities lasted between a few seconds to at most three minutes, the district court properly concluded that such time is *de minimis. See Vega v. Gasper,* 36 F.3d 417, 425 (5th Cir. 1994) (receiving work assignment instructions from supervisors about where an employee was going to work that day prior to the beginning of a shift was not

compensable); *Chambers v. Sears Roebuck & Co.,* 428 Fed. Appx. 400, 417 (5th Cir. 2011) (receiving work assignments on the way to work is not compensable).

In sum, we find no error in the district court's dismissal of FLSA claims for shift relief practice, donning and doffing PPE, and off the clock activities as *de minimis* and not compensable under FLSA.

## C. Stuntz's Individual FLSA Retaliation Claim

Stuntz individually appeals the district court's determination that no triable issue of fact exists as to his FLSA retaliation claims against Ashland and Lion. We disagree with Stuntz's contention as explained below.

FLSA makes it unlawful for an employer "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under this chapter." 29 U.S.C. § 215(a)(3). "As with most federal employment statutes that require a showing of improper motive for which direct evidence is usually lacking, courts evaluate FLSA retaliation claims relying on circumstantial evidence under the evidentiary framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973)." *Starnes v. Wallace*, 849 F.3d 627, 631 (5th Cir. 2017).

### 1. Stuntz's Prima Facie Case

Under *McDonnell-Douglas*, the plaintiff first carries the burden of establishing a prima facie case for retaliation. The plaintiff must show "(1) participation in a protected activity under the FLSA; (2) an adverse employment action; and (3) a causal link between the activity and the adverse action." *Id.* The parties do not dispute that Stuntz engaged in a protected activity by filing the instant FLSA action in March 2014 against Defendants, and Lion agrees that Stuntz's termination is an adverse employment action.

Ashland disputes whether Stuntz's accumulation of verbal and written warnings constitutes an adverse employment action. Stuntz maintains that prior to his lawsuit, he was considered a top employee at Ashland. It was only after Stuntz filed the FLSA action that Ashland began disciplining him for conduct, such as being tardy and missing work due to illness, that went without consequence in the past. Between the period of filing the FLSA action and Lion's purchase of the facility, Stuntz argues his accumulation of disciplinary violations forced him to choose between signing a Last Chance Agreement ("LCA") or accepting immediate termination.

In response, Ashland contends that Stuntz had been disciplined before he filed the grievance and FLSA action. In fact, in July 2011, Stuntz was warned for two incidents of failing to show up to work and failing to contact his appropriate supervisor. In December 2013, Ashland also issued a verbal "performance correction notice" due to Stuntz's failure to follow safety procedures.

"We have held that adverse employment actions consist of 'ultimate employment decisions' such as hiring, firing, demoting, promoting, granting leave, and compensating." *Thompson v. City of Waco, Texas*, 764 F.3d 500, 503 (5th Cir. 2014) (quoting *McCoy v. City of Shreveport,* 492 F.3d 551, 560 (5th Cir. 2007)). Stuntz critically does not dispute the factual findings in his written warnings for violations of the Attendance Policy and safety procedures. Moreover, the accumulation of these written and verbal warnings did not result in an adverse employment decision; instead, Stuntz was given a last chance to correct his workplace behavior through the LCA. *See also Thomas v. Texas Dep't of Criminal Justice*, 220 F.3d 389, 394 n.2 (5th Cir. 2000) (finding two instances of formal discipline did not constitute an adverse employment action); *cf. Alston v. Miss. Dep't of Transp.,* 804 F. App'x 225, 227 (5th Cir. 2020)

(holding that plaintiff demonstrated an adverse employment action through her "suspens[ion] without pay" instead of her three written reprimands successively issued after she filed an internal grievance).

Because Stuntz cannot demonstrate that he suffered an adverse employment action from Ashland, we need not examine the causal prong of the *McDonnel-Douglas* prima facie case, and we affirm the district court's dismissal of Stuntz's retaliation claim against Ashland. However, we still must analyze the retaliation claim against Lion. Stuntz and Lion do not contest the protected activity and adverse employment action prongs, leaving only the causation prong of the *McDonnel-Douglas* prima facie case. Indeed, the prima facie case's causal link inquiry and pretext inquiry overlap, but the prima facie case has a "much less stringent" causation standard. *Starnes,* 849 F.3d at 635. To avoid repetitive analysis and "[b]ecause our review of the district court's decision is de novo," we move on to our "analysis of whether [Lion] met its burden to introduce evidence of a legitimate, nonretaliatory reason for [Stuntz's termination]." *Hernandez v. Metro. Transit Auth. of Harris Cty*., 673 F. App'x 414, 420 (5th Cir. 2016).

## 2. Legitimate, Non-Discriminatory Reason

To satisfy its burden of articulating a legitimate, nonretaliatory reason for the adverse action, "[t]he defendant may meet this burden by presenting evidence that 'if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action.'" *Nichols v. Loral Vought Sys. Corp*., 81 F.3d 38, 41 (5th Cir. 1996) (quoting *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506–08 (1993)). Lion has met its burden by pointing out that through a "no call/no show" violation on January 23, 2015, Stuntz willfully violated his LCA, which was signed by the parties and included an express condition of "immediate discharge" for any violation, "no matter

how minor the infraction," of "Company rules, policies and procedures, including those relating to attendance."

### 3. Pretext

Lion's non-discriminatory reason for Stuntz's termination shifts the burden back to Stuntz to identify evidence from which a jury could conclude that Lion's proffered reason is a pretext for retaliation. *See Fairchild v. All Am. Check Cashing, Inc.,* 815 F.3d 959, 967 (5th Cir. 2016) (noting that the employee "must put forward evidence rebutting each of the nondiscriminatory reasons the employer articulates"). On appeal, Stuntz maintains that pretext can be demonstrated based on (1) Lion's alleged disparate treatment of fellow employee Jonathan Moore, who violated similar attendance policies; (2) disparaging remarks by Hardegree (Plant Manager) and Rogers (Operations/Production Manager) that evidence animus toward Stuntz and his FLSA action; (3) Lion's failure to examine the medical reason behind Stuntz's failure to call in and report to work on January 23, 2015, and (4) the temporal proximity of filing his FLSA action and termination.

First, Stuntz makes no argument as to why Jonathan Moore is similarly situated "under nearly identical circumstances" for his comparator evidence of disparate treatment. *Lee v. Kan. City S. Ry. Co.,* 574 F.3d 253, 259-60 (5th Cir. 2009) (explaining that this requirement is necessary because "employees who have different work responsibilities or who are subjected to adverse employment action for dissimilar violations are not similarly situated") (citing *Little v. Republic Ref. Co., Ltd*., 924 F.2d 93, 97 (5th Cir.1991) and then citing *Smith v. Wal–Mart Stores (No. 471)*, 891 F.2d 1177, 1180 (5th Cir.1990)). As the district court correctly observed, Moore, unlike Stuntz, was not subject to an LCA at the time of his attendance policy violation *and* it was Moore's first violation. After Moore actually signed an LCA, Moore, like Stuntz, was

terminated for violating a condition of the LCA. Thus, Stuntz's claim of disparate treatment as compared to Moore does not establish pretext.[6]

Second, Stuntz points to Rogers' statements about the FLSA action during negotiation meetings. However, Stuntz does not claim error, nor do we find an abuse of discretion, in the district court's determination that Rogers' statements allegedly made during negotiation meetings and written down by Lord (the human resources director) are inadmissible hearsay. The district court also noted that Rogers clarified his comments later during a deposition, explaining that he thought the FLSA action was "high profile" because of the large presence of Union members. Stuntz also cannot rely on Hardegee's *one* out-of-context remark to demonstrate pretext because Hardegee explained that the lawsuit did not "ma[ke him] behave any different [sic]" because he "pride[d] [him]self on being able to separate personal and business." Although comments may demonstrate "pretext" if they "show retaliatory animus" and "were made by the individual primarily responsible for the retaliatory conduct," *Kanida v. Gulf Coast Med. Pers. LP*, 363 F.3d 568, 582 (5th Cir. 2004), the "value of such remarks is dependent upon the content of the remarks and the speaker." *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 225–26 n.9 (5th Cir. 2000) (noting that animus and pretext were demonstrated through the employers' constant reference to an employee as "old bitch"). Stuntz also fails to demonstrate that Hardegee was "principally responsible" for Stuntz's termination. *Id.* at 226.

Third, Stuntz argues Lion's failure to use discretionary authority to review his medical records and excuse the absence that led to his termination

---

[6] To the extent that Stuntz maintains he was unpunished for prior misconduct between 2011 and 2013 as further evidence of "disparate treatment," the dates he relies on predate Lion's purchase of the plant facility in December 2014.

is also evidence of pretext. The Attendance Policy explicitly states that "[t]he procedures . . . *allow* for the Supervisors' discretion and judgement in evaluating individual situations," but the policy also clearly notes that the plant views "no call, no show" violations "as a more flagrant abuse" and "may choose to administer more stringent discipline by skipping a discipline step(s)." Even with this discretionary language and Stuntz's multiple "no call, no show" violations, the facility supervisors still gave Stuntz an LCA and written notice of potential termination based on subsequent workplace violations.

Finally, for temporal proximity "to be persuasive evidence" of causation and pretext, the time between the complaint and termination "must be very close" especially when temporal proximity is offered "alone." *Strong v. Univ. Healthcare Sys., L.L.C.*, 482 F.3d 802, 807–08 (5th Cir. 2007). With temporal proximity as his last chance to demonstrate pretext, Stuntz argues that his protected activity began at the earliest on May 28, 2013 (the filing of the grievance) and at the latest on March 21, 2014 (the filing of the FLSA action). Stuntz's discharge in January 2015 occurred *ten months* after the date he filed the lawsuit. We have held that a "three and a half month time span" between a complaint and termination failed to satisfy temporal proximity, *id* at 807*, and we hold the same here for Stuntz's ten month time span. *Cf. Garcia v. Prof'l Contract Servs., Inc.,* 938 F.3d 236, 245 (5th Cir. 2019) (finding inference of pretext when plaintiff demonstrated temporal proximity, disparate treatment of a similarly situated employee, *and* harassment from a supervisor after the company learned of the protected activity).

In sum, because there is no dispute that Ashland did not take an adverse employment action and that Lion's legitimate, nondiscriminatory reason for terminating Stuntz was not pretextual, the district court properly granted summary judgment in Defendants' favor.

Case: 19-40336   Document: 00515602458   Page: 25   Date Filed: 10/15/2020
Case 4:19-cv-00336-MAD   Document 005156023458   Filed 10/15/2020   Page: 25   PageID #: 10220

No. 19-40336

## IV.   CONCLUSION

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment in favor of Defendants.